## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Case No: 2:25-cr-56** |
| | : | |
| | : | |
| **CODY L. PRATER** | : | **JUDGE WATSON** |

### RESPONSE OF THE UNITED STATES TO DEFENDANT'S MOTION TO SUPPRESS

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorneys and Trial Attorney, and herby submits its opposition to the motion to suppress filed by the defendant, Cody Prater. In sum, the defendant seeks to suppress evidence as a result of a search warrant and interview that was conducted at his residence. The interview concluded when the defendant provided the passcode/pin to law enforcement for both his Google Pixel 7 cellular phone and Gaming PC desktop computer and the defendant now seeks suppression of those statements. The defendant alleges (1) law enforcement exceeded the scope of the search warrant in this case; (2) compelled him to provide his passcode and questioned him after he requested an attorney, and (3) failed to provide the defendant with a copy of the search warrant. The remedy, according to the defendant, is suppression of all evidence recovered from all devices seized which contain items of evidentiary value.

As further expanded upon below, the defendant's motion lacks merit for several reasons, namely that the defendant voluntarily provided his passcode, law enforcement never compelled the defendant to provide any information, his request for an attorney was not unequivocal, and suppression is not appropriate because the doctrine of inevitable discovery is applicable here. Further, the defendant is factually incorrect when he asserts that the warrants were not properly

served. The defendant was provided copies of the two separate search warrants that were executed on his person and residence. Therefore, his motion should be denied.

To demonstrate inevitable discovery, the United States requests the Court hold an evidentiary hearing, where testimony will show that the password to the defendant's phone was actually found through an independent effort of law enforcement.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Initiation of the Investigation*

In June 2020, Homeland Security Investigations (HSI) initiated an investigation into the defendant as a result of information regarding individuals who were present in chat groups dedicated to child pornography on an internet-based chat application referred to here as "Application A." An undercover HSI agent ("UC") maintained a presence on Application A in order to monitor the child exploitation and sexual abuse material being exchanged. The following is a brief example of the content noted within "Application A:"

1. *Photo_3157@20-02-2024_12-34-13.jpg.* This image depicted a nude, prepubescent girl sitting in a chair. The prepubescent girl's legs were spread, and her knees were pulled to her shoulders. A nude male wearing glasses was standing next to the chair and was depicted inserting his erect penis into the prepubescent girl's mouth.

2. *IMG_6510.mp4.* This video was approximately 36 seconds in length and depicted an infant less than 6 months old of indeterminate sex being held in the lap of a nude adult male. The infant appeared to be wearing a diaper and a white top. Throughout the duration of the video, the adult male was observed firmly grasping the infant by the back of the head and inserting his penis into the infant's mouth. The infant was observed making facial expressions consistent with gagging. At approximately 10 seconds into the video the adult male rubbed the infant's head and told the infant, "good job." The adult male then returned to the sexual abuse my repeatedly thrusting his erect penis into the infant's mouth.

During the investigation, the UC identified IP address 162.154.160.66 as being active in the chat group dedicated to the exchange of child sex abuse material. Open-source online database checks

revealed IP address 162.154.160.66 was registered to Charter Communications and the account holder was listed as Cody Prater, the defendant, at an address of 317 S. Locust Ave., McArthur, OH 45651. Record checks with the Ohio MBV also revealed the defendant resided at 317 S. Locust Ave. Surveillance revealed his vehicle, a 2007 gray Honda sedan, parked at the residence as well. On or about July 2, 2024, law enforcement used a government issued Apple smartphone to scan for Wi-Fi networks near the residence of the defendant. The scan displayed various Wi-Fi networks and all the networks observed were secured networks. A secured network requires an individual to have a password and/or an encryption key to obtain access to the secured network.

Additional research revealed the defendant had previously been convicted in the Athens County, Ohio Court of Common Pleas on August 5, 2019 for Pandering Sexually Oriented Matter Involving Minors or Impaired Persons in violation of Ohio Revised Code (ORC) § 2907.322 (A)(1), a felony in the second degree, under case number 18CR0184. The defendant was sentenced to four years incarceration on that conviction.

***Two Separate Search Warrants with Biometric Language Are Obtained***

On or about July 9, 2024, two separate federal search warrants were obtained - one for the person of Cody Prater (the defendant) and one for his residence located at 317 S. Locust Ave. in McArthur, Ohio. Both warrants contained the same probable cause affidavit. HSI Special Agent Edward "Ted" LaVigne was the affiant on both warrants, which were approved by Magistrate Judge Chelsey M. Vascura on or about July 29, 2024 under docket numbers 2:24-mj-346 and 2:24-mj-347, respectively. Both warrants were filed under seal and are still sealed to date.

The two warrants authorized the seizure of any and all computers and digital media devices located thereon or therein. (*See* Government Exhibit #1, Search Warrant for the Person of Cody Prater, and Government Exhibit #2, Search Warrant for the Residence of Cody Prater - *Sealed*).

The warrants also included language that stated "this warrant permits law enforcement to compel the subject person (the defendant), while present at the subject premises, to unlock any devices requiring biometric access subject to seizure pursuant to this warrant." *Id.* The language of the biometric portion of the warrant listed all the permissions law enforcement were given in using biometric features, including pressing or swiping the fingers of the defendant to the devices found and holding the devices in front of his face to activate facial recognition features. *Id.* It also stated "the proposed warrant does not authorize law enforcement to compel that the device owner state or otherwise provide the password or any other means that may be used to unlock or access the devices." *Id.*

***Results of Search Warrant for the Defendant's Residence and Person***

Both warrants were executed on or about July 11, 2024. The defendant was present on scene and in sum, approximately 17 electronic devices were seized to include cellular phones, laptop and desktop computers, external thumb drives, and miscellaneous documents. The items of evidentiary value for purposes of this motion include the defendant's Google Pixel 7 Pro cellular phone, Gaming PC containing three internal hard drives, a USB drive containing the "Tails" Operating System (OS), and a Lenovo tablet, all of which were seized from his bedroom. The "Tails" OS is known by law enforcement to be designed to force all user connections to go through the Tor browser and block any non-anonymous connections. When an external device containing the "Tails" system is connected to a computer and utilized to access the internet, no traces of the internet activity conducted will remain on the computer or external device.

***Interview of the defendant***

At the time the search warrant was executed, the defendant was interviewed by two agents with HSI - SA LaVigne and SA Sara Sellers. This took place in the back of a law enforcement

interview van. The defendant was asked preliminary questions, was informed that he was not under arrest, and in an abundance of caution, was provided the *Miranda*[1] warnings. The conversation that ensued afterwards is what is at issue in this motion. Because the chronological order of statements the defendant made are paramount in this Court's determination of whether his Fourth and Fifth Amendment rights were violated, a transcript of the interview is being attached. (*See* Government Exhibit #3 – Transcript of Interview of Cody Prater - *Sealed*[2]). Further relevant summaries are outlined below.

### Evidence Recovered from the Devices

After completing forensic extractions on the devices, law enforcement documented all the items of evidentiary value related to the Indictment currently pending against the defendant at this time. Contained on the "Tails" thumb drive, seized from the defendant's bedroom, was a total of ten videos which depicted male adults engaged in sex acts and the sadistic and masochistic abuse of infants and toddlers. The videos had a download date listed as September 6, 2023. The device was able to be accessed by decoding the drive's password utilizing a list of passwords the defendant had saved in his Google Pixel phone and Gaming PC, all which contained variations of his go-to saved password "gaymer4505".

The Google Pixel cellular phone was also examined and found to contain hundreds of

---

[1] *Miranda* warnings are only required when a suspect is subject to "custodial interrogation[,]" which the Supreme Court defines as "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995) (citations and quotation marks omitted.) Here, law enforcement read the defendant *Miranda* warnings out of an abundance of caution; he was not subject to custodial interrogation when he spoke with SA LaVigne and SA Sellers. *See, e.g.*, *California v. Beheler*, 463 U.S. 1121, 1125 (1983) ("*Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.") (quotation marks omitted); *United States v. Panak*, 552 F.3d 462, 467 (6th Cir. 2009) (no custodial interrogation where, among other factors, a suspect "was never told that she could not leave, that she could not ask the investigators to leave or that she was required to answer their questions.").

[2] The defense provided the audio and video recording of this interview in their initial motion, so the government is not providing that recording again, merely summarizing the recording in a transcript prepared by the attorneys of record.

images of "anime" and images generated using artificial intelligence("AI") programs. The images depicted child sexual assault and bestiality with children. There were also hundreds of videos derived from the "anime" folder which depicted the sexual assault of children, primarily young boys. Law enforcement also learned that the defendant had visited dark web hidden services dedicated to child pornography, including Neverland, KidFlix, PedoLinks, Hurt Land, Boys R Us, and PedoBum. The defendant also had Application A installed on his phone and over 400 messages were recovered in which he was discussing child sexual abuse material, dark web domains, AI, and platforms to create AI-generated material. Search terms the defendant used within Application A included Toddler sex, No limits cp, Hardcore cp, Cp rape, Tor cp, Animal rape, Animals suffering, and Bestiality snuff.

Forensic analysis of the Gaming Desktop revealed hundreds of obscene photorealistic images of minors engaged in sex acts that the defendant produced, including at least 100 images depicting a nude infant/toddler spread on a bed with slit necks and blood on the child's head/face and genital regions, and other obscene depicts of child mutilation, torture, and death. The defendant created these images with Stable Diffusion, a text-to-image AI model that generates high-quality images based on textual descriptions/prompts. Two examples of these file names and their respective prompts are listed below:

1. **File name:** 00084-1218476549.png

    **Prompt:** photo of a nude toddler girl lying on bed, eyes closed, sleeping (pudgy:1.2), nude, nipples, small pussy, (bloody, bloody vagina, gaping vagina:1.3), pale complexion, (hands behind head:1.2), (decapitated, headless:1.4)

2. **File name:** 00108-2275544650.png

    **Prompt:** photo of a nude infant girl lying on bed, eyes closed, sleeping (pudgy:1.2), nude, nipples, small pussy (bloody, bloody vagina, gaping vagina:1.3), pale complexion, (hands behind head:1.2), (bag over head:1.2)

The defendant's other devices contained thousands of images that he received and

distributed depicting infants and prepubescent minors engaged in oral sex, vaginal and anal penetration, masturbation, bondage, bestiality, and other sexual activity with other adults and other minors.

On April 10, 2025, the Grand Jury returned an Indictment that charged the defendant with child exploitation related offenses. (Doc. #18, Indictment). Specifically, the defendant is charged in Count One with Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2) & (b)(1); in Count Two with Transportation of Obscene Matters in violation of 18 U.S.C. § 1462; in Count Three with Receipt of Obscene Visual Representation of Child Sexual Abuse, in violation of 18 U.S.C. § 1466A(a)(1) & (d)(4); in Count Four with Possession of Obscene Visual Representation of Child Sexual Abuse, in violation of 18 U.S.C. § 1466A(b)(1) & (d)(4); and in Count Five with Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(4)(B) & (b)(2). The case was initially set for jury trial on September 29, 2025. (Doc. #26, Trial Order).

## LEGAL ANALYSIS

"The Fourth Amendment provides, in pertinent part, that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches* and seizures, shall not be violated.'" *United States v. Bah*, 794 F.3d 617, 630 (6th Cir. 2015) (emphasis in original) (quoting U.S. CONST. amend. IV). Pursuant to this Constitutional requirement, "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (internal citations and quotations omitted). In turn, "a search warrant may only be issued upon a showing of probable cause." *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010).

The Fifth Amendment provides individuals the right to not be compelled by the

government to provide testimony that would tend to prove that the individual committed a crime. "The [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." *United States v. Monia*, 317 U.S. 424, 427 (1943) (footnote omitted). "The Fifth Amendment privilege against compelled self-incrimination is not self-executing." *Roberts v. United States*, 445 U.S. 552, 559 (1980). To that end, a person who "desires the protection of the privilege ... must claim it at the time he relies on it." *Salinas v. Texas*, 570 U.S. 178, 183-84 (2013) (plurality) (citations and quotation marks omitted). Even so, an individual who previously invoked his right to silence may waive that right if he "initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Once reinitiated, officers can continue to question the individual until a reassertion of rights. *Id*.

Regardless of any Constitutional objection to the investigation in the instant case, the inevitable discovery doctrine provides an exception to the exclusionary rule. *Nix v. Williams*, 467 U.S. 431, 444 (1984). Indeed, if "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." *Id*.

The Supreme Court went on to note that when "the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is *no nexus sufficient to provide a taint* and *the evidence is admissible*." *Id*. at 448 (emphasis added). Indeed, "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted *regardless of any overreaching by the police*, there is no rational basis

8

to keep that evidence from the jury in order to ensure the fairness of the trial proceedings." *Id*. (emphasis added). However, proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." *Id*. at 444 n. 5.

When seeking to prove inevitable discovery, the prosecution has two options. "The inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995). Thus "an alternate, independent line of investigation is not required for the inevitable discovery exception to apply." *Id*.

Even if the Court finds that a Fourth Amendment or Fifth violation has occurred, suppression is a drastic remedy that is not appropriate in this case. The "costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." *Herring v. United States*, 555 U.S. 135, 141 (2009). There are "substantial social costs" in suppressing evidence and "letting guilty and possibly dangerous defendants go free—something that 'offends basic concepts of the criminal justice system.'" *Id*. For suppression to be warranted, "[t]he benefits of deterrence must outweigh the costs." *Id*. For these reasons, suppression should only apply "'where it result[s] in appreciable deterrence.'" *Id*. (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).

In view of these legal principles, the defendant's motion to suppress overgeneralizes the facts and fails to accurately represent the order in which they occurred and the nuances of the conversations, statements, and order of events is crucial in assessing whether the defendants' rights

were violated. A more careful analysis of the facts shows that (1) the Special Agents did not exceed the scope of the warrant when they *asked* the defendant for his phone password (not compelling him to do so); (2) the password was provided in the context of a cordial and honest conversation, and was not improperly coerced; (3) the contention that the warrants were not properly served is factually inaccurate— copies of both warrants were left with the defendant but the probable cause affidavits were not provided and the defendant is not entitled to them, and (4) even though the defendant made statements about not wanting to answer questions without a lawyer, the two purported invocations are not unequivocal, and even if they were, suppression is not the remedy because at least two unique avenues of inevitable discovery are present. For those reasons, the defendant's motion should be denied.

## **ARGUMENT**

### *Scope of Warrant & Passwords:*

The defendant incorrectly argues (1) that the Special Agents exceeded the scope of the warrant they were authorized to execute when they asked the defendant to give his passcode; and (2) that because the Special Agents asked the defendant to provide his phone password, his right against self-incrimination was violated and his statement giving that information was coerced and involuntary. In summary, the defendant argues that he was threatened with arrest, and this caused him to comply with demands by law enforcement to give up passcode. These arguments are logically intertwined, inaccurate, and will be addressed together.

First, the search warrants do not prohibit law enforcement from asking the defendant for a password. The biometric language only prohibits a judicially authorized demand for a password. The exact language of the warrant states "the proposed warrant does not authorize law enforcement to compel that the device owner state or otherwise provide the password or any other means that

may be used to unlock or access the devices." It therefore follows that Special Agents could only exceed its scope by impermissibly demanding or compelling a password, which they did not do, but which the defendant argues is the reason he provided the passcode.

During the interview with the defendant, at approximately the 10:15:54 minute mark, SA LaVigne tells the defendant "Alright Cody, um, so today, we served a search warrant on your premise and the search warrant allows us to seize all your electronic devices. We like to speak to you about some things but before we do I gotta read you your *Miranda* rights …and then you can decide if you want to talk." The defendant nods his head in the affirmative and SA LaVigne proceeds to provide the defendant his *Miranda* warnings despite the fact that the defendant was not in custody.

After receiving the warnings, the defendant stated "at this time, I don't even know what this is about, and I need to know more about what's going on." (10:16:42). SA LaVigne stated to the defendant "alright, I will tell you because you are going to get a copy of the search warrant, we have probable cause that you have been uploading/downloading child exploitation material." (10:17:01-10:17-13). SA LaVigne then goes on to state "that's why we're here, so if you want to talk to us we can talk to you about it, if not you just hang out here while we conduct a search of your home, now a search warrant does, um, do you have a cellular phone?" The defendant answers "yes" and SA LaVigne responded, "the search warrant does compel you to provide any biographical[3] (*sic*) that would open up your phone…device." The defendant asks for a copy of said warrant and while SA LaVigne is locating it, HSI SA Sara Sellers discusses with the defendant how he is not under arrest, he does not have to talk to them, but that if he does it could help him

---

[3] SA LaVigne begins his interview of the defendant with biographical information about the defendant such as his name and date of birth. Later in the interview, post-*Miranda,* when he discusses biometric provisions of the warrant, he inadvertently uses the word biographical instead of biometrical.

later on. The defendant responds, "that being said, it would be in my best interest to not answer any questions without a lawyer present." (10:19:16).

As further outlined below, SA LaVigne informed the defendant that he is not entitled to the affidavit in this case. He informed the defendant of this because the defendant asked to see the part within the affidavit that mentions the biometric protocols. He then asked the agents "and if I don't comply, just asking" and he is informed by SA LaVigne that he could be "subject to arrest." The defendant then repeats what he just heard stating "I can be subject to arrest. Ok, alright I'll comply to avoid arrest" but is again informed by SA LaVigne that he is not under arrest today.

What SA LaVigne told the defendant was wholly accurate. If he did not give over his biometric information pursuant to the warrant, he could be subject to arrest. This is true as the warrant allowed law enforcement to compel the use of biometrics and should the defendant have defied the court order, he could have been subject to arrest. At no point did they inform the defendant that he must provide the password or be subject to arrest, an important distinction in assessing if they exceeded the scope of the search warrant, which they did not.

The conversation with the defendant continued, during which, SA LaVigne asked him how many phones he had. The defendant responded, "I have my pixel." SA LaVigne then asked "is it a code, facial ID, or both?" (10:23:28). The defendant stated "it is a fingerprint and a code" and when asked by SA LaVigne what the code was, the defendant responded "its 4505." He then provided the same passcode, 4505, when asked if the computer inside his home required a pin. (10:23:38).

The defendant claims that his statements were involuntary. However, courts "don't infer coercion lightly." *United States v. Jacobs*, 63 F.4th 1055, 1058 (6th Cir. 2023). Here, the preponderance of the evidence shows that the defendant's statements were voluntary. *United*

*States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). The Sixth Circuit "has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Id.* "Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Id.* All of these factors weigh in favor of finding that the defendant's statements were voluntary.

First, when the conversation was initiated with the defendant, he confirmed his name and his age – 26 years old. He was asked about his family and the name of his probation officer, which he provided, clearly indicating he had been involved with the criminal justice system previously. (10:11:47-10:15:39). This was confirmed later in the conversation with the defendant when he indicated he needed more information about what was going on before speaking with law enforcement. The defendant even told agents that he had been through this situation before. Next, as previously noted, the defendant was provided his constitutional rights out of an abundance of caution and the entirety of the conversation he had with the agents lasted less than one hour. The brevity of this interaction with the defendant did not warrant a food or bathroom break, nor did the defendant request one. None of the factors that indicate police coercion are present here.

In his motion, the defendant argues that he gave over his passwords because he was threatened with arrest. That is not what the facts show. Specifically, SA LaVigne never said the defendant had to give his passwords. That understanding was internalized by the defendant alone. The defendant was seated in a large police van meant for interviews, across the table from two

HSI special agents.  He was informed he was not under arrest numerous times and engaged in a cordial conversation with the agents which included questions he initiated himself.  He was not handcuffed, he was told he was free to leave when the search was over, and he was informed that it would take a while to get his devices back.  The agents who questioned the defendant were considerate and good-natured.  There were no strong-arm tactics or deceptive strategies or aggressive tones.  Clearly, the conversation in the van did not involve police activity that was objectively coercive.

The defendant also fails in any argument that his will was so overcome by the coercion that he made incriminating statements about his phone passcode and computer pin to the agents.  This becomes even clearer when the agents returned to the defendant after conducting a search of the residence.  When they returned to ask about the "Tails" OS drive they found, SA LaVigne stated "I have a question for ya, do you have the password to your Tails...like a drive" to which the defendant responded, "No. I don't know what that is."  SA LaVigne then asked "do you have a storage you have a passcode on" to which the defendant responded "no."  (11:22:27).

As outlined above, the USB drive encrypted with the "Tails" OS was the device that contained child pornography that formed the basis of Counts One and Five of the Indictment.  The defendant denied knowledge of the "Tails" OS and its passcode because he knew that child pornography was on the device, a device encrypted with the same passcodes he used in some variation with every other relevant device i.e. "gaymer4505."  He was untruthful with law enforcement in this line of questioning because he knew what the implications for him were should he provide it and he made a conscious decision not to do so.  Had he been in such a coercive environment that he felt compelled and with no choices otherwise other than to incriminate himself, he would have been truthful.  The defendant himself, early in the interview, stated "you

also have to realize I have been through this situation before[.]" (10:22:12-10:22:23). His prior experience informed the present. The defendant thought he could give the password to his phone, which only contained obscenity, but not the Tails device. In so doing he demonstrated that he knew he could decline to provide a password, and he did so as he tried to keep the agents from finding material that he knew to be illegal – videos of infants being brutally raped. The defendant was under no illusion that he must provide a password. *He exercised his desire to decline*. This is not coercion; this is clear thinking on the part of the defendant.

***The Defendant Did Not Unequivocally Request Counsel and the Inevitable Discovery Doctrine Applies:***

The defendant argues next that law enforcement violated his rights by asking him for his passwords following his equivocal statements about consulting with an attorney. The defendant's request for an attorney was not unequivocal. But, if this Court were to find that the agents erred by asking the defendant a question after he requested counsel, the misstep does not constitute culpable conduct requiring deterrence through application of the exclusionary rule. Ultimately, agents would have inevitably discovered the same evidence even if the defendant had not provided his phone passcode. The Court should accordingly deny the defendant's motion to suppress.

In their initial encounter with the defendant, as noted above, SA LaVigne and SA Sellers outlined some of the allegations for the defendant to make him aware of their investigation. They did that at his request. After the defendant asked for a copy of the biometric portion of the warrant and while SA LaVigne was locating it, SA Sellers discussed with the defendant how he is not under arrest, he does not have to talk to them, but that if he does, it could help him later on. The defendant responded, "that being said, it would be in my best interest to not answer any questions without a lawyer present." (10:19:16). Immediately after, the defendant then began asking

questions of the agents about the seeing the warrant, his right to read the biometric portion, and what would happen if he didn't comply with biometrics. After that, Sa LaVigne informed the defendant he was not under arrest and tells him to "take a breath, relax, you are not under arrest at this moment…like I said, we do have evidence that led us here today and we just want an opportunity to speak with you." (10:21:40). SA Sellers then followed up and stated: "…we are looking for people who are producing…material. Our goal is to help the minor children in that material, in those videos, in those photos…talking to people like you every day brings us closer and closer to identifying those kids, identifying…in the video…I just want you to understand the big picture of today and not so much, I'm in trouble, I'm being arrested…" to which the defendant responded: "you also have to realize that I've been through this situation before, it's not something, I, I, at this point I would rather not[.]" (10:22:12-10:22:23).

SA LaVigne responded "and that's your right…that's why we have the system we have, if you are not comfortable talking, there's an opportunity to talk to us later, but you would have to do so through counsel and things like that…like I said you are going to have to wait in here while we conduct our search and when we are done, I will give you…when we are done and gather all the evidence we need…actually I am going to hang out here for a bit because they're probably going to bring us your devices…" (10:22:25-10:23:10). Shortly after this, the defendant was asked for his phone passcode and computer pin which he provided as outlined above.

"[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459 (1994) (emphasis in original) ("'Maybe I should talk to a lawyer"—was not a request for counsel.") "If the suspect's statement is not an

unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id*. Moreover, the Supreme Court "decline[d] to adopt a rule requiring officers to ask clarifying questions" if a suspect makes an ambiguous request for counsel. *Id*. at 461. Here, the defendant's brief statement that "it would be in my best interest" to have a lawyer is like the equivocal request for counsel in *Davis*.

Even then, a defendant who previously requested counsel may waive that right by initiating conversation with law enforcement. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (defendant's question "Well, what is going to happen to me now?" was a waiver of right to counsel after officers told her she was not required to speak with them). Once reinitiated, officers can continue to question the individual until a reassertion of rights. *Id*. Here, the defendant made a statement early on in the conversation that "it would be in my best interest to not answer any questions without a lawyer present." He was never asked direct questions about his child exploitation activities. However, it is important to note from there on out, he continued to engage in back-and-forth conversation with the agents. *See United States v. Clay*, 320 F. App'x 384, 387-88 (6th Cir. 2009) (affirming admission of defendant's statement after defendant chose to reinitiate question after invoking both rights to silence and to counsel). He inquired into how certain processes worked related to the seizure and hopeful return of his devices, asked follow-up questions, and engaged the agents on scene in cordial conversation. This is the type of "generalized discussion about the investigation" that the Supreme Court has found to constitute a waiver of a suspect's right to counsel. *Bradshaw*, 462 U.S. at 1046.

Moreover, the items of evidentiary value on the defendant's Google Pixel phone and Gaming PC computer would have been inevitably discovered even if the defendant had not provided the password and indeed were discovered, through several untainted efforts in the

investigation.

First, the Gaming PC in the defendant's bedroom was not encrypted[4] and contained several variants of the phone password. Thus, law enforcement did not need a password when they performed a complete extraction of the three internal hard drives associated with the computer. Once they independently completed a forensic extraction of those hard drives, the following passwords were found and added to the library of known passwords for the defendant: gaymer4505 was used at least four times; Gaymer4505@ was used at least three times; and jasper4505 was used at least twice. These are just examples of a larger list of accounts that the defendant had saved within the Gaming PC which list nearly all of the defendant's dozens of passwords, almost all of which included the four digits 4505. (*See* Government Exhibit #4 – Gaming PC Password Chart - *Sealed*). To use the words of the *Nix* Court, the evidence in question *was* inevitably discovered *without reference* to any police error or misconduct, and thus there is no nexus sufficient to provide a taint and the *evidence is admissible*.

Most notably, courts have not required actual discovery through alternative means. It has been enough that either the investigation would have uncovered the evidence or that compelling facts establish that the disputed evidence would have been discovered. Here, investigators actually discovered the phone password through alternate means.

Second, the judicially authorized warrants in this case allowed the Special Agents to utilize the defendant's biometrics, or in this case, fingerprints. When the Google Pixel phone was located in the bedroom of the defendant, it was photographed. When asked how the phone opens, the defendant told the agents it opened by fingerprint and code. This is a fact capable of ready verification through the viewing of the photograph.

---

[4] The agents asked the defendant if the device had a PIN and the defendant provided it but the PIN was never needed to forensically acquire and analyze the information on the device.



Indeed, in the bottom half of the photo towards the bottom of the phone, there is a small pad indicating that a fingerprint can be used.  *See* How to unlock your Pixel phone with your finger, https://support.google.com/pixelphone/answer/6285273?hl=en (last visited Sept. 10, 2025).

While the defendant's providing of the password to unlock his Google Pixel phone made accessing the device and seizing the contents easier for law enforcement, forensic extraction of the device would have occurred regardless of the defendant's providing his password.  *See United States v. Hilton*, 625 F. App'x 754, 760 (6th Cir. 2015) (because investigators "would have inevitably discovered the Blackberry even without Hilton's statements, the phone was not fruit of the unwarned statements."); *United States v. Garcia*, 496 F.3d 495, 505-06 (6th Cir. 2007).  Thus, even if the password was obtained from the defendant in violation of his right to silence, law enforcement would have inevitably discovered the evidence on the device through the use of court ordered biometric language which would compel him to unlock the phone with his fingerprint, and

the relevant evidence from his Google Pixel phone should not be suppressed.

This situation is similar to *United States v. Morales.* In the *Morales* case, a judge issued a search warrant ordering the search of the defendant's residence and expressly authorized agents to seize "all computer passwords and other data security devices designed to restrict access" and to obtain from Morales "the display of any physical biometric characteristics (such as fingerprint/ thumbprint, facial characteristics, or iris display) necessary to unlock any devices requiring such biometric access." *United States v. Morales,* 2009 WL 2104091 *2 (E.D. Mo. 2022). The defendant was ordered to enter his own password into an iPhone that was recovered thereby giving agents access to child pornography on the device. *Id* at 7. The court in *Morales* found that no Fifth Amendment violation existed and even if there had been, the inevitable discovery doctrine applied. *Id.* Specifically, the court found that agents came to Morales's house ready to conduct an on-site forensic analysis of seized devices and would nevertheless been able to successfully unlock the phone and perform an extraction at an FBI forensics lab using specialized forensic tools. *Id.* at 6. Much like *Morales,* the extraction of the Google Pixel phone belonging to the defendant was inevitably going to be opened in that passwords the defendant saved in other devices would have led to the discovery of the password to the phone, likely almost right away.[5]

Furthermore, at least one court in this circuit has concluded requiring biometrics such as fingerprints does not violate the Fifth Amendment. *In re Search Warrant No. 5165,* 470 F. Supp. 3d 715 (E.D. Ky. 2020). Here, the agents were authorized to scan the defendant's fingers on the phone, which establishes that the contents of the phone would have inevitably been discovered.

---

[5] For example, investigators can use a "dictionary" with variations of words and numbers (i.e., usernames, emails, birthdays, etc.) associated with a computer user to assist in brute force password attacks. Commonly available forensic software and simple techniques "can find a single dictionary word password within one second." *See* https://usa.kaspersky.com/resource-center/definitions/brute-force-attack (last accessed Sept. 16, 2025). Even where law enforcement does not use a "dictionary" approach, "a six-character password that includes numbers has approximately 2 billion possible combinations" and would take only 3.5 days to crack. *Id.*

This is also not speculative. The warrants allowed it, the defendant confirmed it, and the phone features a fingerprint pad that the defendant would have placed his finger on to unlock the phone.

**Warrant Service:**

The defendant's final argument is that all of the evidence should be suppressed because the warrant was not served. The defendant asserts that he "was never given a copy of the warrant nor time to read through it." Doc. # 36 at 8. This argument is factually and legally incorrect. The warrants were served and, in fact, left with the defendant, but the defendant was not entitled to the probable cause affidavit, which was filed under seal and remains still sealed to date.

Pursuant to Fed. R. Crim. P. 41(f)(1)(C), "[t]he officer executing the warrant must give a copy of the *warrant* and a receipt for the property taken to the person from whom, or from whose premises, the property was taken *or leave a copy of the warrant and receipt at the place where the officer took the property*." (*emphasis added*). This rule is statutory in nature and is not required by the Fourth Amendment. *United States v. Crumpton*, 824 F.3d 593, 617 (6th Cir. 2016). "Although the procedural steps enumerated in [Rule 41] are important and should not be disregarded, they are ministerial and absent a showing of prejudice, irregularities in these procedures do not void an otherwise valid search." *Id*.

First, the warrants were served consistent with the practice of law enforcement, by placing them on a table in the house, and photographing them for proof. Photos of both warrants being placed on the table of the defendant's residence after they were executed were taken and provided in discovery in December 2024 under Bates USA_000191 and USA_000192. (*See* Government Exhibit #5 – Photographs of Search Warrants - *Sealed*).

Second, Rule 41(f)(1)(C) requires law enforcement to provide only "a copy of the warrant and a receipt for the property taken[,]" not the probable cause affidavit. A District Court in

Kentucky noted that after providing the two required documents, "Rule 41 did not require [the agent] to provide Defendant with anything else during the execution of the search warrant." *United States v. Russell*, 2009 WL 1033829 (E.D. Ky. 2009). What is more clear is that suppression has always been a "last resort, not [a] first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Indeed, the exclusionary rule is triggered only in cases where police conduct is sufficiently culpable such that that deterrence is worth the price paid by the justice system. *Herring v. United States*, 129 S.Ct. 695, 700 (2009). Clearly, this is not a ground to suppress any evidence at all.

***Suppression Entirely Unwarranted:***

Suppression of evidence is not appropriate in this case. The "exclusionary rule is not an individual right and applies only where it result[s] in appreciable deterrence. In addition, the benefits of deterrence must outweigh the costs." *Herring*, 555 U.S. at 141. The actions of the agents in this case is not the type of deliberate, reckless, or grossly negligent conduct courts have traditionally found to require deterrence. The agents approached their interview of the defendant with care for the defendant and his rights, acknowledging their importance while also informing the defendant that there were certain things he would have to do – like provide his biometrics. Clearly, the potential or even need for deterrence here is unquestionably low. In viewing the totality of the circumstances, and the agent's ability to inevitably discover it, this is not a case that warrants suppression, especially when considering the costs of it. The defendant is a recidivist sex offender who downloaded child sexual abuse material and produced obscene images of mutilated children displaying their genitals—all after spending years in prison for a child pornography conviction. He received and possessed videos that are among the most horrific available on the dark web—infants being raped, and the defendant provided the demand in the market for child sexual abuse material that the Sixth Circuit has said clearly drives the supply. *See*, *e.g.*, *United*

*States v. Bowers*, 594 F.3d 522, 528 (6th Cir. 2010).

If the costs of suppression weren't already weighty enough, the defendant also made his own obscenity using AI. In order to do this, he included inputs causing the creation of images of, among other things: decapitated babies and bloody genitalia. When Chief Justice Roberts warned in *Herring* that courts should consider the weight of "letting guilty and possibly dangerous defendants go free," he would almost assuredly include the conduct alleged in this case, and the defendant in this case.

## CONCLUSION

The United States respectfully submits that the defendant's motion to suppress should be denied.

Respectfully submitted,

DOMINICK S. GERACE II
UNITED STATES ATTORNEY

*s/ Emily Czerniejewski*
EMILY CZERNIEJEWSKI (IL 6308829)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Office: (614) 406-3572
E-mail: Emily.Czerniejewski@usdoj.gov

*s/Tyler Aagard*
TYLER AAGARD (NC 54735)
Assistant United States Attorney

*/s/ Eduardo Palomo*
EDUARDO PALOMO (TX 24074847)
Trial Attorney
Eduardo.palomo2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Response was served this 2nd day of October, 2025, electronically on counsel for the defendant.

s/*Emily Czerniejewski*
EMILY CZERNIEJEWSKI (IL 6308829)