UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | Case No: 2:25-cr-56 |
| | : | |
| | : | |
| CODY L. PRATER | : | JUDGE WATSON |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorneys and Trial Attorney, and hereby submits this closing argument requesting that the Court deny defendant Cody Prater's motion to suppress. In his motion, the defendant incorrectly argues that law enforcement agents discovered child pornography on his digital devices only after "compelling him to provide self-incriminating evidence by compelling his passcode." Doc. # 36 at 9 (Motion to Suppress). Law enforcement did not compel the defendant to provide his passcode and, in any event, law enforcement did not need the defendant's passcode to access his devices. The record is clear that law enforcement did not need the defendant to disclose his passcode because forensic examiner Chancey Davis bypassed the passcode to his gaming computer using standard forensic tools, which enabled her to discover the passcodes to his other devices. There is "no doubt" that any competent forensic examiner would "be able to access the defendant's devices using industry standard methods[.]" Doc. # 64 at 100 (Suppression Hearing Transcript). The Court should deny the defendant's motion to suppress.

### The November 3, 2025 Hearing

On November 3, 2025, Special Agent (SA) Edward "Ted" LaVigne and Digital Investigative Analyst Chancey Davis testified at a hearing on the defendant's motion to suppress.

Page **1** of **15**

SA LaVigne testified about his interview of the defendant. SA LaVigne is an investigator for the Department of Homeland Security who executed a search warrant at the defendant's residence. SA LaVigne spoke with the defendant in a mobile interview van, where the defendant was repeatedly told he was not under arrest. *Id*. at 21. During this conversation, SA LaVigne asked the defendant for the passcode to his devices. The defendant provided the passcode to his phone, but did not provide the passcode to his "Tails"[1] thumb drive. During the conversation, the defendant repeatedly asked SA LaVigne questions and never unambiguously requested counsel. SA LaVigne further testified that he left a copy of the warrant with the defendant. *Id*. at 31; *see also* Doc. # 51 at 81-83 (Government's Exhibit 5, Photographs of Warrant) (*under seal*).

Ms. Davis testified about her forensic examination of the defendant's devices. Ms. Davis is employed by the Department of Justice's High Technology Investigative Unit where she has developed a high degree of proficiency in forensic examinations of digital devices in child exploitation investigations. *See* Doc. # 45 (United States' Notice of Expert Testimony); Doc. # 64 at 64 (Suppression Hearing Transcript). Ms. Davis examined exact copies of the defendant's devices and located videos depicting the sexual abuse of young children, including a video depicting an adult male forcing his penis into the mouth of an infant that was "a couple months old[.]" Doc. # 64 at 79. Ms. Davis definitively stated that she would not have needed the defendant to disclose his passcodes in order to examine his devices. *See*, *e.g.*, *id.* at 67, 72, 74, 99-100.

### Law Enforcement Did Not Coerce Statements From Defendant

As further expanded upon below, the defendant's motion to suppress lacks merit for several reasons, namely that the defendant voluntarily provided his passcode, law enforcement never

---

[1] "Tails" is a computer operating system designed to facilitate anonymity. Tails is commonly booted from a thumb drive and users may enable features that allow them to save files to that thumb drive. *See* https://tails.net/about/index.en.html (last accessed Nov. 26, 2025).

compelled the defendant to provide any information, and his request for an attorney was not unequivocal. The Sixth Circuit "has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999). "Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *Id*. All of these factors weigh in favor of finding that the defendant's statements were voluntary. The defendant's motion to suppress therefore fails all three prongs.

SA LaVigne's conduct and the setting of the interview weigh against finding that the police activity was objectively coercive. Officers knocked on the defendant's door and announced their presence and purpose when they arrived at the defendant's residence. Doc. # 64 at 13. The defendant was handcuffed for approximately five minutes while officers conducted a safety sweep of the residence and then removed the handcuffs. *Id*. at 15-16. Law enforcement did not point weapons at the defendant, nor did they use physical force or threaten him. *Id*. at 16.

Then, SA LaVigne asked the defendant if he wanted to speak with him and the defendant replied that he did. *Id*. at 18. SA LaVigne escorted the defendant to an interview van with Homeland Security Investigations Special Agent Sara Sellers. *Id*. at 19. The defendant's conversation with SA LaVigne and SA Sellers took place between 10:00am and 10:30am. The defendant was not deprived of food or sleep. The defendant was not locked in the van and he was permitted to exit the van to use the restroom and to smoke. *Id*. at 55. Both SA LaVigne and SA

Sellers told the defendant multiple times that he was not under arrest. *See*, *e.g.*, *id*. at 21, 33.

The interview began with simple biographical questions. *Id*. at 20. SA LaVigne informed the defendant of his rights. *Id*. at 44. SA LaVigne asked the defendant, "do you wish to waive your right and speak to us?" and the defendant replied "at this time—I don't even know what this is about, first. I need to know more about what's going on." (10:16:42). SA LaVigne stated to the defendant "alright, I will tell you because you are going to get a copy of the search warrant, we have probable cause that you have been uploading/downloading child exploitation material." (10:17:01-10:17-13).

SA LaVigne was polite and mild mannered throughout the interview. The defendant asked SA LaVigne multiple questions, including questions about the search warrant's authorization to use biometric features to unlock digital devices. *Id*. at 22. During the interview, the defendant mentioned an attorney, but never unambiguously requested counsel. The defendant's statement that it "would be in my interest not to answer any questions without a lawyer present" was not an unambiguous request for counsel. *See Davis v. United States*, 512 U.S. 452, 459 (1994) ("'Maybe I should talk to a lawyer'—was not a request for counsel."). After the defendant made that statement, SA LaVigne showed the defendant the search warrant and explained various provisions in the warrant. (10:19:22-10:19:52). SA LaVigne did not ask the defendant any questions during this period. The defendant then reinitiated the conversation by asking, "if the warrant is the entire affidavit, wouldn't I have to be able to see that?" SA LaVagine replied, "that's not how it works." (10:20:10-10:20:20). *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (defendant's question "Well, what is going to happen to me now?" was a waiver of right to counsel after officers told her she was not required to speak with them).

SA LaVigne and SA Sellers reassured the defendant multiple times that he was "not under

Page 4 of 15

arrest today" and explained that he does not have to talk to them, but did inform him that it could help him if he spoke with them. (10:20:38). After a brief and cordial explanation about the nature of child exploitation investigations, SA LaVigne asked the defendant for the passcode to his phone and the defendant stated "4505." (10:23:27-10:23:40). During this exchange, the agents did not raise their voices, badger the defendant, or pepper him with questions. These circumstances are not objectively coercive.

The defendant's history and characteristics weigh in favor of finding that his statements were voluntary. The defendant is 26 years old and does not suffer any deficit in intellect or education. The defendant had been previously arrested for a child pornography offense and was incarcerated for that offense. *See id*. at 8. At the time of his interview, the defendant was under the supervision of a probation officer. *See id.* at 56. The defendant himself stated "you also have to realize I have been through this situation before, this is not a thing that…I've—at this point in time, I'd rather not … [.]" (10:22:12-10:22:23). In other words, the defendant understood the consequences of speaking to law enforcement and even declined to honestly answer certain questions that would incriminate, such as his knowledge about the "Tails" operating system and the passcode to access this "Tails" drive.

Nothing in the record shows that the defendant was "especially sensitive to pressure, that he had been physically abused, or that his emotional or psychological equilibrium had been upset by his treatment at the hands of officials." *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir. 1992). Further, law enforcement did not employ "means 'so offensive to a civilized system of justice that they must be condemned.'" *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). Instead, SA LaVigne and SA Sellers were polite and accommodating to the defendant. They clearly explained his rights and informed him

multiple times that he was not under arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984) ("cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare."). They did not raise their voices or physically intimidate the defendant. The defendant was not deprived of sleep, food, or water, nor could he have been—the conversation took place between 10:00am and 10:30am and lasted less than 30 minutes. The defendant was not handcuffed during the conversation, and he was permitted to leave the van to use the bathroom and to smoke. And—importantly—the defendant initiated conversation by asking the agents questions about the search warrant and engaging the agents in a back and forth colloquy about what was going on with the search warrant at his residence.

In view of the totality of the circumstances, the defendant's statements were not the products of objectively coercive police conduct. The Court should accordingly reject the defendant's argument that he was coerced into disclosing the passcode to his phone.

### Ms. Davis's Examination of the Defendant's Gaming Computer

It is clear from the record that even if this Court were to find that law enforcement compelled the defendant to provide his password or that the defendant's mentioning of an attorney constituted an unequivocal request for counsel, suppression is not appropriate because the doctrine of inevitable discovery is applicable here.

Ms. Davis testified that she personally bypassed the password on the defendant's gaming computer using routine forensic techniques and that she discovered the defendant used the password gaymer4505 (or a variation of such) to log on to multiple online accounts. Ms. Davis further testified that any reasonable forensic examiner would have used the passwords found on his gaming computer to discover that the passcode to the defendant's cell phone was 4505 and the

passcode to his Tails thumb drive was gaymer4505@.

Ms. Davis first explained the standard methods used to acquire a forensic image—i.e., a "bit for bit or exact copy"—of the defendant's devices, including his gaming computer. *Id*. at 65. She stated that forensic examiners commonly use a forensic tool called a Tableau TX1 to create an exact copy of a device and then transfer that exact copy to a separate "clean" hard drive for further examination. *Id*. The Tableau TX1 ensures the integrity of original evidence items by using a "write blocker" which prevents an examiner from altering data on the device. *Id*. at 97.

While processing a forensic image, the Tableau TX1 creates an "imaging log" with a "hash value" for a forensic image, which enables forensic examiners to verify the integrity of the forensic image. *Id*. at 98. A hash value[2] is a "unique string of letters and numbers" created by a cryptographic algorithm which functions as a "digital thumbprint for a device[.]" *Id*. at 96. Ms. Davis testified that she "look[s] at the imaging log that's sent with the forensic image and I compare the hash value from the original item to the forensic image and I make sure that they match up. So the Tableau TX1 will check the matches as well to make sure that it's all good, but then I will also personally go in and look at every single digit or letter [of the hash value] and make sure that it's correct." *Id* at 98.

Ms. Davis then testified that she did not need the defendant's password for his gaming computer to access data on that device. This is because the creation of a forensic image with the Tableau TX1 bypasses a device's operating system and allows an examiner to "look at the raw data or all of the files and folders that are on a device, so a password is not necessary." *Id*. at 68. In discussing her examination of the defendant's gaming computer, Ms. Davis testified that

---

[2] "A cryptographic hash function generates a 'fingerprint' of an input string. For example, if we were to hash the entire text of JRR Tolkien's 'The Lord of The Rings' series using the SHA 256 algorithm, we would get a 256-bit output unique to that book's text. If we changed even a single letter in the book, the output hash would be wildly different." https://blog.boot.dev/cryptography/how-sha-2-works-step-by-step-sha-256/ (last accessed Nov. 24, 2025).

knowing the defendant's password "would not have been relevant at all […] Because when I forensically image the device, it bypasses that password." *Id*. at 69. In addition, Ms. Davis confirmed that the Tableau TX1 would be able to do this for an unencrypted password protected device. *Id*. at 71. The defendant's gaming computer was encrypted at the time it was seized. *See id*. at 71-72.; Doc. # 46 at 2 (Supplemental Notice of Expert Testimony) ("the defendant's desktop computer was not encrypted").

Ms. Davis stated that she is "extremely confident" that she would be able to bypass the defendant's passcode on his gaming computer if she re-examined it "[b]ecause when I create a forensic image, it would bypass the Windows user profile." *Id*. at 99. When asked if she needed the defendant's "password at all to access the data that was on the [gaming] computer[,]" Ms. Davis succinctly replied, "No." *Id*. at 99-100.

Ms. Davis next testified that she located multiple passwords that the defendant saved to his gaming computer. Ms. Davis testified that she examined the data from the defendant's gaming computer using a program called Axiom by Magnet Forensics. *Id*. at 64. When asked, "with Magnet Axiom, do you need a password to that device to examine the data on the device?" Ms. Davis replied, "No." *Id*. at 72. Ms. Davis testified that she then "examined the files and folders on the [gaming computer] device and any internet history." *Id*. Ms. Davis explained that the defendant's web browser stored multiple usernames and passwords that the defendant used to access websites and online accounts, including his Gmail account, his television streaming service, and his Facebook account. *Id*. at 74. Ms. Davis stated that she would not have needed the defendant to disclose any of his passwords to view those login credentials on his gaming computer. *Id*.

Ms. Davis testified that the password for most of the defendant's accounts was gaymer4505 and that he reused the password approximately 20 times. *Id*.

Page **8** of 15

**Ms. Davis's Examination of the Defendant's Phone and "Tails" Thumb Drive**

Ms. Davis next testified about how she examined a forensic image of the defendant's cell phone using Cellebrite, an industry-standard forensic program with password-breaking capabilities. *Id*. at 75. Ms. Davis testified that the passcode to the defendant's phone is 4505 and that it would "not [be] difficult at all" to guess the defendant's passcode. *Id*. at 76. When asked whether she had "to rely on any statements from the defendant to access his phone[,]" Ms. Davis replied, "No." *Id*. Ms. Davis explained that, if she "was unsure [of the defendant's passcode], I would analyze the desktop computer first. I would look at the passcodes that have already been used. And apparently we can see here 4505 was used multiple times. 4505 would have been my very first guess." *Id*.

Even where a forensic examiner has no information about a password, Ms. Davis explained that there are forensic programs that employ a "brute force" method to discover passwords by trying "every single password option until you get the correct one. So in this example, the defendant had a four-digit passcode so it can only be from 0000 to 9999. So the forensic software would start at 0000 and just continue on until you get to the correct passcode." *Id*. at 79. Ms. Davis explained that "it would take, at most, three hours" to crack a four-digit passcode. *Id*. at 80.

Ms. Davis also analyzed a forensic image of the thumb drive that the defendant used to run the "Tails" operating system. Ms. Davis testified that the "drive itself was not password protected but the persistent memory or the secret compartment was password protected." *Id*. at 78. Ms. Davis testified that the password for the secret compartment was gaymer4505@. *Id*. She explained that forensic examiners with Homeland Security Investigations discovered the password "by going through all of the available passcodes that were on the desktop computer. So like Exhibit 10 [a list of the defendant's online passwords]. And they wrote down every single variation possible of this

Page **9** of **15**

password and then they were able to unlock it." *Id*. Ms. Davis testified that the level of skill necessary to unlock the "Tails" drive is "very low" and that she would not have had to rely on any statements from the defendant to unlock the device. *Id*. at 79.

Ms. Davis explained that she would have been able to discover this password using a "dictionary" attack where "she would have created every single variation that I could of gaymer4505 and I would have put this into the forensic tools and told it to start with this list first before moving on to brute force." *Id*. at 81. Ms. Davis stated that a dictionary attack is highly effective in discovering a password because—as is the case with the defendant—"most people will reuse the same passcode or some variation of it." *Id*. at 82.

Ms. Davis stated that she had "high confidence" that she would have discovered the defendant's passcodes "[b]ecause he used similar variation[s] of the same passcode over and over, and I would have used 4505 as my very first guess." *Id*. at 82-83. Ms. Davis explained that she had "[n]o doubt" that she would be able to access the defendant's devices using industry standard methods: "I think any other forensic examiner would do the same. It's what anyone would do. And the defendant used the same password over and over. And it's similar to locking your door but putting a key under the mat. Someone can still find the key and get in." *Id*. at 100.

### Inevitable Discovery: Any Competent Forensic Examiner Would Be Able To Access Defendant's Devices

"[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v. Strieff*, 579 U.S. 232, 238 (2016). "[T]he doctrine applies where the facts indicate that the officers inevitably would have discovered and seized the tainted evidence by following routine procedures." *United States v. Garcia*, 496 F.3d 495, 506 (6th Cir. 2007). The inevitable discovery doctrine operates only to put "police in the same position they would have been in without the illegality, not a worse one."

*United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022) (citing *Murray v. United States*, 487 U.S. 533, 541 (1988)). The government bears the burden of proving inevitable discovery by a preponderance of the evidence. *Nix v. Williams*, 467 U.S. 431, 444 (1984).

Here, it is a virtual certainty that any competent forensic examiner using industry-standard tools would have bypassed the password on the defendant's gaming computer. Ms. Davis's testimony firmly establishes that the process of creating a forensic image of the defendant's gaming computer enabled forensic examiners to circumvent the operating system's password. A forensic examiner simply would not need the defendant's passcode to analyze his gaming computer. A forensic examiner would not need to use extraordinary tools or methods to bypass the password on the defendant's gaming computer—commercially available tools commonly used by professionals in the field of digital forensics would enable any reasonable examiner to do the same. This proposition is not speculative—this is exactly what Ms. Davis did when she examined the forensic image of the defendant's gaming computer. The defendant offers no reason to conclude otherwise.

Ms. Davis's testimony further establishes that commonly used forensic tools like Axiom by Magnet Forensics enabled her to search for passwords stored in the gaming computer's web browser and that she located dozens of the defendant's passwords. The passwords from the defendant's web browser were consistent across devices and the defendant used simple variations of the password gaymer4505 multiple times. The variations often included simple capitalization (e.g., Gaymer4505) or appending a single character at the end of a password (e.g., Gaymer4505@).

Any reasonable forensic examiner would have been able to simply guess the defendant's passcodes to his phone and "Tails" thumb drive even without using forensic software—and that is what happened in this case. The passcode for the defendant's phone was 4505, which would have

been any reasonable forensic examiner's "very first guess" in attempting to unlock the phone. Doc. # 64 at 76. Similarly, forensic examiners went "through all of the available passcodes that were on the desktop computer. … And they wrote down every single variation possible of this password and then they were able to unlock it." *Id*. at 78. In creating this list, examiners easily identified gaymer4505@—which is nearly identical to passwords discovered on the defendant's gaming computer—as the correct password for the defendant's Tails drive.

In contrast, the defendant offers no reason to conclude that investigators needed him to disclose any of his passwords in order to access his devices. The defendant's claim that Ms. Davis did not personally create the forensic images of the defendant's devices does not undermine the integrity of those forensic images. Whether Ms. Davis personally imaged the devices is immaterial to her subsequent examination of data on that device. Ms. Davis testified that she is able to validate the integrity of a forensic image through a feature in the Tableau TX1 designed for that very purpose. Here, Ms. Davis personally validated the integrity of the forensic image of the defendant's gaming computer and used an industry standard forensic program to locate dozens of passwords involving simple variations of gaymer4505.

Similarly, Ms. Davis's estimate that "typically, 70 percent of the time we'll get the password[,]" *id.* at 82, does not weigh against a finding of inevitable discovery. Ms. Davis stated that "30 percent of the time people typically use more difficult passcodes so it takes a lot longer or we're unable to get into it." *Id*. at 88. Ms. Davis gave that percentage as an example of the forensic capabilities to discover passcodes of *all* lengths, variations, and complexity. Ms Davis clarified that "it depends on the complexity of the passcodes" but in this case, she confirmed that the defendant's passcode was very simple: the "passcode was only four digits." *Id.* at 82. On redirect examination, Ms. Davis even clarified that, in approximately 30 percent of her cases,

offenders use "very sophisticated passwords that typically are like a sentence or a bunch of different unique characters" and that those same issues do not apply in this case. *Id*. at 101. The better interpretation of Ms. Davis's testimony is that the defendant's 4505 passcode for his phone and his use of simple variations of the password gaymer4505 place this case comfortably within the 70 percent of cases where she is able to independently discover a passcode.

Finally, vague questions about a "Titan M2 security system" or irrelevant security updates to iPhones (the defendant's phone is a Google Pixel) have little to do with this case. *See id*. at 90-91. In addition to the passcode 4505 being easy to simply guess—it would have been Ms. Davis's "very first guess"—the search warrant authorized law enforcement to compel the defendant to unlock his phone using biometric access. *See id*. at 10-22 (Testimony of Special Agent LaVigne); Doc. # 51 at 28 (Search Warrant) (*under seal*). In other words, if an ambiguous security feature prevented forensic examiners from unlocking the defendant's phone using standard forensic tools, law enforcement would have compelled the defendant to unlock his phone with his thumbprint.

In sum, a preponderance of the evidence shows that law enforcement would have inevitably discovered the passcodes to the defendant's devices. The Court should accordingly deny the defendant's motion to suppress.

## CONCLUSION

The United States respectfully submits that the defendant's motion to suppress should be denied.

Respectfully submitted,

DOMINICK S. GERACE II
UNITED STATES ATTORNEY

*s/ Emily Czerniejewski*
EMILY CZERNIEJEWSKI (IL 6308829)
Assistant United States Attorney

        303 Marconi Boulevard, Suite 200
        Columbus, Ohio 43215
        Office: (614) 406-3572
        E-mail: Emily.Czerniejewski@usdoj.gov

        *s/Tyler Aagard*
        TYLER AAGARD (NC 54735)
        Assistant United States Attorney

        */s/ Eduardo Palomo*
        EDUARDO PALOMO (TX 24074847)
        Trial Attorney
        Eduardo.palomo2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Response was served this 1st day of December 2025, electronically on Stacey MacDonald and Soumyajit Dutta, counsel for the defendant.

s/*Eduardo Palomo*
EDUARDO PALOMO (TX 24074847)
