IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
|     Plaintiff, | | |
|     vs. | : | Case No. 2:25-CR-56 |
| | : | |
| CODY L. PRATER, | | JUDGE MICHAEL H. WATSON |
|     Defendant. | : | |

### DEFENSE POST HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE

The defense submits this post-hearing brief in further support of the Defendant's Motion to Suppress Evidence (ECF No. 36) and Response to Governments Reply (ECF No 59) The suppression hearing established precisely what the Fourth, Fifth and Sixth Amendments were designed to prevent: a coercive custodial interrogation conducted in disregard of constitutional safeguards, followed by a search that exceeded the scope of judicial authorization. The government bears the burden of proving that the statements taken by Cody Prater – and the search of his devices – were lawful.  The testimony of Special Agent Edward Levine and Chancy Davis shows the opposite.

Cody Prater's constitutional rights were not merely brushed aside; they were systematically overridden.  Each violation shaped the encounter from the moment agents arrived at his home and directly produced the evidence the government now seeks to use against him. Rather than confront these constitutional defects, the government attempts to sanitize the agents' conduct by invoking inevitable discovery – an extraordinary doctrine that cannot rescue evidence

obtained through clear violations of *Miranda*, *Edwards* and the Fourth Amendment.

**Suppression Hearing Testimony**

Agent Lavine is not a novice.  He served with Homeland Security for 15 years; after seven years with DC law enforcement.  (TR 36: 17-19) Seventeen officers executed the search warrant at Cody Prater's home.  (TR 38-39:23-2).  Eight officers comprised the armed entry team. (TR 39:3-4) When Mr. Prater opened the door, their weapons were drawn.  (TR 39: 11-12, 18-20) Mr. Prater was immediately removed from his home and placed in handcuffs for approximately ten minutes before agents relocated him to a law enforcement van – described as a "rolling interview room" – with covered windows and limited space.  (TR 40:12-18; 42: 3-7) From the moment Mr. Prater was handcuffed and isolated in this confined, police-dominated environment, he was in custody for the purpose of Miranda.

Once inside the van, agents read Mr. Prater his *Miranda* rights. When asked if he wished to waive them and speak, Mr. Prater immediately hesitated: "At this time I don't even know what this is about. I need to know more about what's going on."  (TR 44:4-7).  He neither stated that he would speak nor signed a waiver for. (TR 44:8-11)

Rather than honor this hesitation, Agent Sellers interjected – improperly – by dangling the prospect of speaking to a magistrate judge on Mr. Prater's behalf.  Mr. Prater responded by unequivocally stating "That being said, it would be in my best interest not to answer any questions without a lawyer present." (TR 45: 7-8) This was a clear invocation of both his right to counsel and his right to remain silent.

Agents acknowledge they understood this invocation.  Agent Levine testified that Mr. Prater's statements indicated he "didn't want to talk about why we were there." (TR-52:2) Agent Levine further admitted he understood Mr. Prater was exercising his constitutional rights. (TR

52: 7-13)

Rather than scrupulously honoring the invocation, agents continued to engage Mr. Prater while withholding critical information about the scope of the search warrant. Agent Levin showed only the heading of the warrant, not the operative language. (TR 46:13-15) He concealed the provisions explicitly stating that agents were prohibited from compelling Mr. Prater to provide passcodes. (TR 46: 20-22)

Agents never informed Mr. Prater they were barred from requiring his passcode. (TR 47: 2-7) Instead, they allowed him to believe the agents' assertions about what the warrant "allowed" though he had no meaningful way to verify it. (TR 47: 8-11) Mr. Prater had to take the Agents' word for what the warrant did and did not allow. (TR 47: 17-18)

When Mr. Prater, still invoking his rights, asked what would happen if he did not comply, the agents told him he could be "subject to arrest" – despite having no arrest warrant and no legal authority to make such a threat. (TR 48: 4-12) Mr. Prater again stated that he had "been through this situation before" and that he would "rather not speak." (TR 51: 15-21) This was his third invocation. Approximately one minute after Mr. Prater invoked his right to silence yet again, Agent Levine asked: "what is the code on the phone." (TR 52-53: 21-5). Mr. Prater still isolated in a police van, and still under the belief he would face arrest if he did not comply – provided the passcode.

The agents never asked whether he now wished to waive his previously invoked rights. (TR 53: 10-20). They never clarified that he had the right not to provide the passcode. They never informed him that the warrant expressly prohibited compelling him to do so. And they never re-administered *Miranda* or sought any waiver – written or otherwise.

I. **Agents Exceeded the Scope of the Search Warrant**

The Supreme Court and Sixth Circuit are unequivocal: officers must execute search warrants strictly within the bounds of their particularized terms. *Groh v. Ramirez*, 540 U.S 551 (2004); *United States v. Lazar*, 604 F. 3d 230 (6th Cir. 2010)(a search exceeding a warrant's scope is unconstitutional regardless of good faith.)   The warrant defines the outer limits of permissible intrusion; when officers exceed it, the search becomes warrantless.

Here, it is undisputed that the warrant authorizing the search of Mr. Prater's home and electronic devices explicitly prohibited agents from compelling him to provide any biometric identifiers or device passcodes.   Despite this clear restriction, agents neither provided Mr. Prater a copy of the warrant nor showed him the language delineating what the magistrate judge had – and had no – authorized.   Depriving Mr. Prater of that information left him entirely dependent on the agents' representations of their authority.

Agents then used this information imbalance to coerce compliance.   When Mr. Prater hesitated and asked what would happen if he did not comply, agents told him he could be "subject to arrest", even though they possessed no arrest warrant. By threatening arrest to obtain a passcode the warrant expressly barred them from compelling, the agents not only exceeded the scope of the warrant but transformed a judicially authorized search into an extra-judicial coercive interrogation.

The warrant's prohibition on compelling passwords and biometric identifiers was not mere boilerplate.   The Supreme Court and multiple circuits recognize disclosure of a passcode as a testimonial act protected by the Fifth Amendment.   *In re Search Warrant No. 5165,* 470 F. Supp. 3d 715, 732. (E.D. Ky 2020) Courts have repeatedly held that compelling a suspect to reveal the "contents of their minds" – including passwords, PINS, and other unlocking

credentials constitutes testimonial self-incrimination. *Doe v. United States*, 487 U.S. 201, 212 (1987). The government cannot bypass these constitutional protections by threatening arrest in violation of the warrant's explicit terms.

Because agents obtained the passcode only through conduct expressly forbidden by the warrant and prohibited by the Fifth Amendment, any subsequent search of the devices was beyond the judicial authorization and is therefore unconstitutional.

**II. Mr. Prater's Passcode Disclosure was Both Testimonial and Compelled**

The disclosure of a device passcode is a testimonial act because it communicates the contents of a person's mind.   Couts have consistently held that compelled production of knowledge-based information – such as passwords or PINS – implicate the Fifth Amendment. *Doe v. United States*, 487 U.S. 201 (1987).   Because the act of revealing a passcode is inherently testimonial, the government must establish that Mr. Prater's disclosure was voluntary, knowing and uncoerced.   It cannot do so here.

A statement is involuntary unless it is "the product of a free and deliberate choice rather than intimidation, coercion or deception.   *United States v. Woolridge*, 64 F. 4th 757 (6th Cir. 2023).   If a confession is coerced, "it must be excluded, whatever may have been the character of the compulsion. *Miranda v. Arizona*, 384 U.S. 436, 462 (1966) quoting *Wan v. United States*, 266 U.S. 1, 14-15 (1924)) The Sixth Circuit applies a totality-of-the-circumstances analysis to determine whether a suspect's will was overborne. *Ledbetter v. Edwards*, 35 F. 3d 1062, 1067(6th Cir. 1994)(internal quotation marks omitted)   "[C]oercion can be mental as well as physical." *Blackburn v. State of Alabama*, 361 U.S. 199, 206 (1960).

Although the administration of *Miranda* warnings is relevant, it does not end the voluntariness inquiry. *Dickerson v. United States,* 530 U.S. 428, 444 (2000)    The burden

remains on the government to prove voluntariness by a preponderance of the evidence.  *Loza v. Mitchell*, 766 F. 3d 466, 478 (6th Cir. 2014)(citing *Missouri v. Seibert*, 542 U.S. 600, 609 (2004)(plurality opinion)

>Under Sixth Circuit precedent, a confession is involuntary when three conditions are met:
>
>(1) the police activity was objectively coercive;
>(2) the coercion in question was sufficient to overbear the defendant's will; and
>(3) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.

*Ledbetter*, 35 F. 3d 1062 (6th Cir. 1994) All three factors are satisfied here.

First, the environment was undeniably coercive.  Mr. Prater was confronted at his front door by eight armed officers with weapons drawn, while a total of seventeen law enforcement personnel were present on scene.  He was immediately handcuffed, removed from his home, and kept retrained for approximately ten minutes before being transported to a law-enforcement van configured as an interrogation room.  The van was small, enclosed, and had curtained windows. Two agents sat inside with him.

Second, Mr. Prater clearly and repeatedly invoked his constitutional rights. He never affirmatively waived *Miranda* and never signed a waiver. He expressly stated that he wanted an attorney present. Despite this, agents continued to question him and pressed for compliance.

Third, the agents directly threatened him with arrest even though they guised it as "a possibility" and no arrested warrant existed and the search warrant explicitly barred compelling such information.  A threat of arrest is one of the most potent forms of coercion; the agents "cordial tone" does not diminish the inherently intimidating nature of such a threat.  What matters is the substance of the communication, not the politeness with which it was delivered.

It is only after being told he could be "subject to arrest" that Mr. Prater provides the passcode, and he did so in response to a direct request: "what is the code on the phone?" The

temporal proximity between the threat and the disclosure leaves no doubt that the threat was the decisive motivating factor.

### III. Mr. Prater Unequivocally Invoked his Right to Counsel

Cody Prater's statement – "it would be in my best interest not to answer any questions without a lawyer present." – was an unequivocal invocation of his right to counsel under any standard. (TR 45: 7-8) The Sixth Circuit has held that even an informal or colloquial reference to an attorney may constitute a clear invocation. In *United States v. Zakhari,* 85 F. 4th 367 (6th Cir. 2023), for example, a defendant's request to call his sister – whom he identified as an attorney – was sufficient to invoke his right to counsel. The law does not require legal precision from a suspect; it requires only an objectively clear request for counsel.

Mr. Prater met that standard. Once a person communicates "his desire to deal with the police only through counsel," he is " not subject to further interrogation by the authorities until counsel has been made available to him." *Edwards v. Arizona,* 451 U.S. 477, 484-85. (1981). The rule is not advisory. It is a categorical command: "[A]ll questioning must cease." *Smith v. Illinois*, 469 U.S 91, 98 (1984).

This "bright-line prohibition" exists to prevent investigators from "wear[ing] down the accused" through "explicit or subtle" means – until he incriminates himself despite his earlier request for counsel" *Edwards*, 451 U.S at 485, *Smith*, 469 U.S. 98. The Supreme Court has emphasized that the protection is designed to eliminate not only overt pressure but also "subtle, deliberate or unintentional" attempts to persuade a suspect to talk after invoking his rights. *Id.*

Here, the agents did precisely what *Edwards* forbids. Mr. Prater invoked his right to counsel plainly and unambiguously. Yet agents continued to question him, misrepresented their authority under the warrant, and ultimately extract a passcode – testimonial information –

through the ongoing custodial interrogation the Constitution requires them to stop.

### IV. Inevitable Discovery Doctrine Does not Apply

The government bears the burden of proving inevitable discovery. To meet that burden, it must show that an independent, untainted investigation inevitably would have led them to the same evidence. *United States v. Alexander*, 540 F. 3d 494, 502 (6th Cir. 2008). This requires more than speculation. The government must present concrete, credible evidence demonstrating that discovery would have occurred regardless of the constitutional violation. *United States v. Kennedy*, 61 F. 3d 494 (6th Cir. 1995); *United States v. Nasser*, 476 F. 3d 1115, 1122 (6th Cir. 2007)(rejecting inevitable discovery absent contemporaneous, independent steps toward lawful discovery).   The government has made no such showing here.

At the Suppression hearing, forensic examiner Chancy Davis testified that the images she reviewed from the cellphone and gaming console were forensic mirror copies made by other agents and forwarded to her. (TR 83: 20-25) Those agents already possessed the passcodes – obtained directly from Mr. Prater through the coercive interrogation described above.  Ms. Davis testified that she had no knowledge of whether the imaging agents access the phone or console using the passcodes before creating the forensic copies. (TR 85-86: 19-1).

Critically, Ms. Davis confirmed that she made **no attempt** to access Mr. Prater's phone using any forensic unlocking tools, including brute-force, dictionary attack or hybrid attack. (TR 88: 1-15). As the interview video and agents' own testimony show, law enforcement did not attempt to use biometrics at the scene either.   Instead, they asked for the passcode after threatening Mr. Prater with possible arrest if he didn't comply.   No testing, no alternative methods, and no independent efforts were made to determine whether the device could be accessed without Mr. Prater's compelled disclosure.

Even if such tools had been used, Ms. Davis explained that they are not reliably effective. She testified that brute-force or similar tools succeed in only **70%** of cases. (TR 88: 16-20) In **30%** of cases, agents are unable to access a device at all. (TR 89: 18-22). Moreover, Ms. Davis had **no knowledge** of the specific characteristics of Mr. Prater's phone – its operating system, security patches, firmware, or encryption level- factors that direct affect whether forensic tools can bypass a passcode. (TR 90-91: 22-2, TR 95: 4-8)   When pressed on whether agents could have eventually accessed Mr. Prater's phone without his passcode, Ms. Davis conceded that the answer was uncertain: "It depends". (TR 95: 9-11)

Uncertainty is fatal to the government's position. Inevitable discovery requires inevitability – not possibility, not speculation, and certainly not a 70% chance. The government must show the evidence **would** have been discovered, not that it *might* have been. Because the government failed to establish an independent, lawful means of accessing the device – and because only successful access resulted directly from Mr. Prater's coerced, involuntary disclosure - the inevitable discovery doctrine does not apply.

## CONCLUSION

The Constitution imposes clear boundaries on law enforcement, and those boundaries were repeatedly crossed in this case. Agents exceed the scope of the warrant, disregarded Mr. Prater's unequivocal invocation of his right to counsel, continued a custodial interrogation in violation of *Edwards*, and coerced a testimonial disclosure of his passcode through threats of possible arrest and misrepresentation of their authority. The resulting search was not the product of lawful procedure but of constitutional violations that shaped every stage of the encounter.

The government has failed to meet its burden of proving voluntariness, compliance with

the warrant, or the applicability of the inevitable discovery doctrine. The evidence obtained from Mr. Prater's statements and the search of his electronic devices is tainted by these violations and cannot be sanitized after the fact.

**WHEREFORE,** for the reasons set forth above, the defense respectfully requests this Court grant this motion to suppress all evidence seized from Mr. Praters electronic devices in this case.

Respectfully submitted,

JOSEPH MEDICI
FEDERAL PUBLIC DEFENDER

 /s/ Stacey MacDonald
Stacey MacDonald (WA 35394)
Assistant Federal Public Defender
Soumyajit Dutta (OH 76762)
Assistant Federal Public Defender
10 West Broad Street, Suite 1020
Columbus, Ohio 43215-3469
Telephone: (614) 469-2999
Facsimile: (614) 469-5999
Stacey_MacDonald@fd.org
Soumyajit_dutta@fd.org

Attorneys for Defendant
Cody L. Prater

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

/s/ Stacey MacDonald<br>
Stacey MacDonald (WA 35394)<br>
Assistant Federal Public Defender